[Civ. No. 4592. Third Appellate District.—December 19, 1932.]

LOOMIS FRUIT GROWERS' ASSOCIATION (a Corporation), Respondent, v. CALIFORNIA FRUIT EXCHANGE (a Corporation), Appellant.

Devlin & Devlin & Diepenbrock, C. F. Kimball and Lowell & Lowell for Appellant.

U. S. Webb, T. L. Chamberlain, Arthur W. Eddy and R. C. McKellips for Respondent.

PLUMMER, J.—In this action the plaintiff had judgment as hereinafter stated, from which judgment the defendant appeals.

(For convenience, the plaintiff will hereafter be referred to as "Association" and the defendant as "Exchange".)

On the sixth day of July, 1907, an agreement was entered into between the Association as the party of the first part and the Exchange as party of the second part, for the marketing of deciduous fruits, which agreement, though

made only for one year, was to run from year to year until notification of cancellation was given by either party to the other prior to the thirty-first day of December of the current year. The agreement, so far as material here, is contained in paragraphs numbered 1, 7 and 8, paragraph numbered 1 reading as follows:

"The party of the first part hereby appoints said Exchange as its marketing and selling agent for all deciduous fruits under its control, (except such fruit as shall be sold for cannery purposes and ripe fruit); for which the Exchange shall deduct from the growers' account sales seven (7) per cent of the gross receipts in full compensation for such service, including Eastern brokerage, telegrams and all other expenses incurred by the Exchange in so doing."

Paragraph 7 of the agreement reads:

"It is also agreed that although the crop contract to ship fruit may be made directly between the Exchange and the individual grower, yet the Exchange hereby undertakes to protect, as far as possible in its power, the interests both of the grower and the Association through which said growers' fruit may be locally handled."

Paragraph 8 is in the following words:

"In consideration of the party of the first part holding stock in the Exchange, it is hereby agreed that it shall be paid any dividend based on the gross amount realized on all fruit received for marketing through party of the first part in the same manner as growers are entitled to any dividend in accordance with the last paragraph of Article XIX of the By-Laws, less any amounts that may be due to individual growers who are members of party of the first part and who are also entitled to receive direct this dividend, having carried out the provisions contained in the paragraph of Article XIX of the By-Laws referring to growers' shipments."

At the time of the execution of the agreement between the Association and the Exchange, article XIX of the by-laws of the Exchange read:

"Reserve Funds and Dividends. The net earnings of each year shall be subject, after a six per cent (6%) dividend has been paid on the paid-up stock, to a charge of twenty (20%) per cent towards a reserve fund for

the first three (3) years, after which the continuance of this charge shall be left to the decision of the board of directors. When a further amount is available for distribution, it may be divided, at the discretion of the directors:— half amongst all growers who have signed contracts and shipped consistently with this Exchange during the season when this dividend has been earned, based proportionately on the gross amount realized by the fruit of such shippers, the other half to be a further dividend on the stock issued.''

Article XIX of the by-laws of the Exchange was amended from time to time until March 25, 1920, when the final version read as follows:

''The Corporation is to pay its members the total amounts of proceeds received by it from the sale of the products of such members in excess of the members' proportion (determined as herein provided) of the aggregate of the net cost of operation and the dividend requirement. The term 'Members', as used herein, means all persons (including individuals, corporation or associations) who have entered into contracts, as permitted by these By-laws with the Corporation covering the sale by the Corporation of deciduous fruit products for account of such persons.

''The term 'Net Cost of Operation' as herein used means the excess during each calendar year of the total of all expenses of every kind which the directors of the corporation may consider necessary or advantageous or may be obliged to incur (inclusive of depreciation, obsolescence and depletion of the physical properties of the corporation, and all losses, over all income which may accrue to the corporation from trading operations and other sources (inclusive of realized depreciation).

''The term 'Dividend Requirement' as herein used means the amount required to enable the payment of an annual dividend upon the fully paid capital stock at the rate of eight per cent (8%) per annum, computed in the same manner as interest upon borrowed money, plus the amount of income and profit taxes as have been paid during each calendar year.

''In anticipation of the annual determination of the Net Cost of Operation and of the Dividend Requirement the corporation is to withhold from the proceeds of the products of

its members such percentage thereof as the directors may designate. The aggregate of the amounts so withheld during each calendar year is to be designated as 'Withholdings'.

"At the end of each calendar year the Net Cost of Operation and the Dividend Requirement shall be determined. In the event that the Withholdings shall exceed the aggregate of the Net Cost of Operation and Dividend Requirement then such excess shall be apportioned between the members in proportion to the proceeds of the products of each, and as so proportioned shall be credited to individual Withholdings Repayable account with said members. Such Withholdings Repayable are to be paid in such installments at such times as may be determined by the directors but the Withholdings Repayable of any year must be completely paid within five years from the end of the year of the withholding. At the time of making any payment of Withholdings Repayable the Corporation may deduct from the payment then due to any member the amount of any indebtedness from such member to the Corporation or a portion of such indebtedness, but a complete statement of the amount so deducted and of the indebtedness upon which applied shall be furnished such member.

"In the event that the Withholdings shall be less than the aggregate of the Net Cost of Operation and the Dividend Requirement then such deficiency shall be apportioned between the members in proportion to the proceeds of the products of each, and as so apportioned shall be charged to individual Withholdings Deficiency Accounts with said members. Such Withholdings Deficiencies are to be collected in such installments at such times as may be determined by the directors.

"The sole source of revenue of the corporation is the deduction of the Dividend Requirement from the Withholdings."

The complaint in this action, omitting all formal parts and allegations not necessary to be considered, sets forth the following facts:

During the year 1923, the Association delivered to the Exchange deciduous fruits of the value of $737,876.19. From this sum the Exchange withheld from the Association

7 per cent of such proceeds in the sum of $51,651.33; that thereafter, and as provided by the by-laws amended as herein stated, the Exchange determined that 4 per cent of the proceeds should be paid to the Association in installments as follows: In January, 1924, 1 per cent, to wit, $7,398.76; in November, 1924, 1 per cent, to wit, $7,398.76; on November 15, 1928, 2 per cent, to wit, $14,797.52; that the installments due in January and November, 1924, have been paid; that the installment due and payable December 15, 1928, has not been paid; that during the year 1924, the Association delivered to the Exchange, and the Exchange received for shipment deciduous fruits upon which it received the sum of $553,012.53, from which sum the Exchange withheld from the Association 7 per cent, amounting to $38,710.88; thereafter, the board of directors of the Exchange determined that there should be paid upon the withholdings 4 per cent of the proceeds received from the sale of fruits, and there became payable to the Association from the Exchange the following sums, to wit: On January 17, 1925, 1 per cent, to wit, $5,530.12; in November, 1925, 1 per cent, to wit, $5,530.12; in December, 1929, 2 per cent, to wit, $11,060.20; that the Exchange has paid to the Association the installments payable in January and November, 1925; that the installment payable December 19, 1929, has not been paid; that during the year 1925, the Association delivered to the Exchange, and the Exchange received from the Association for shipment, and shipped deciduous fruits for which it received $746,502.88, withholding from the Association 7 per cent of said proceeds in the sum of $52,255.20; thereafter the Exchange determined that there should be payable from the withholdings 4 per cent in the following installments, to wit: In January, 1926, 1 per cent, to wit, $7,465.03; in November, 1926, 1 per cent, to wit, $7,465.03; in December, 1930, 2 per cent, to wit, $14,930.06; that there has been paid by the Exchange to the Association the installments provided for to be paid in January and November, 1926; that the installment of 2 per cent due in December, 1930, has not been paid, nor any part thereof; that during the year 1926, the Association delivered to, and the Exchange received from, the Association for shipment, and shipped fruit for which it received the sum of

$717,775.64, out of which sum it withheld from the Association 7 per cent, to wit, $50,244.29; that thereafter the board of directors of the Exchange determined that there should be paid to the Association from said withholdings 3 per cent thereof in the following installments: In January, 1927, 1 per cent, to wit, $7,177.76; in November, 1927, 1 per cent, to wit, $7,177.76; in December, 1931, 1 per cent, to wit, $7,177.76; that there has been paid to the Association by the Exchange the installments falling due January and November, 1927; that the installment of 1 per cent due December, 1931, has not been paid, nor any part thereof; that during the year 1927, the Association delivered to, and the Exchange received from the Association for shipment deciduous fruits for which it received the sum of $628,111.45, and withheld from the Association 7 per cent of said proceeds in the sum of $43,967.80; thereafter, the board of directors of the Exchange determined that there should be paid out of said withholdings to the Association, 3 per cent, in the following installments, to wit: In January, 1928, 1 per cent, to wit, $6,281.11; in November, 1928, 1 per cent, to wit, $6,281.11; in December, 1932, 1 per cent, to wit, $6,281.11; that the Exchange has paid to the Association the installments due as aforesaid in January and November, 1928; that the installment of 1 per cent due December, 1932, has not been paid, nor any part thereof; that during the year 1928, the Association delivered to the Exchange deciduous fruits for shipment, and the Exchange received from the Association and shipped fruit for which it received the sum of $784,166.67; that out of said sum the Exchange withheld from the Association 7 per cent in the sum of $54,891.67; that thereafter the board of directors determined that there should be paid to the Association from the withholdings 3¾ per cent in the following installments, to wit: In January, 1929, 1 per cent, to wit, $7,841.67; in November, 1929, 1 per cent, to wit, $7,841.67; in December, 1933, 1¾ per cent, to wit, $13,722.93; that the Exchange has paid to the Association the installment due in January, 1929; that the installments due in November, 1929, and December, 1933, respectively, have not been paid, nor any part thereof. Interest also was claimed by the Association on account of moneys

withheld as herein stated, which moneys were due and payable from the Exchange to the Association.

The court found in accordance with the allegations of the complaint and entered judgment in favor of the Association against the Exchange in the sum of $69,315.98 and costs. The court also determined that the Exchange was indebted to the Association in the further sum of $30,381.14, which will become payable in installments by the Exchange to the Association as follows, to wit: January 11, 1932, $7,177.66; January 10, 1933, $9,421.67; January 8, 1934, $13,781.71. The judgment also provided that execution should issue for the amount of each installment as the same became due and payable.

Paragraph IX of the findings of the court, relative to the action of the Exchange following each succeeding amendment of article XIX of its by-laws, is as follows: ''That during the year 1907, to and including the year 1928, withholdings repayable were calculated, declared and paid by defendant-corporation to plaintiff, and to its other shippers in accordance with Article XIX as it existed during the time for which withholdings repayable were ordered; that each time said Article XIX was amended, withholdings repayable were calculated, declared and paid in accordance with the amended article in existence during the time for which withholdings repayable were declared.'' This finding appears to be unchallenged by appellant, and an examination of the record discloses that after the amendment to article XIX of the by-laws of the Exchange in 1920, installment payments out of withholdings were declared and paid in accordance with the terms and provisions of article XIX up to and including the termination of the agreement between the Association and the Exchange. The same practice was followed during all the preceding years.

The court further found that the Association has performed, all and singular, the terms and conditions required by it to be kept and performed under the agreement entered into between the Association and the Exchange on the sixth day of July, 1907.

Upon this appeal the appellant contends that the Association has forfeited all rights to refunds out of the withholdings hereinbefore mentioned, for the following reasons, to

wit: First: That the Association failed to ship consistently through the Exchange as required by the agreement and by-laws. Second: That in no event should the judgment have included a recovery of patronage dividends based upon ripe fruits and grapes. Third: That the judgment was and is erroneous in excluding patronage dividends not due and payable at the time of the entry of judgment.

While it may have been within the contemplation of the parties at the time of the execution of the agreement, there is nothing in its terms which makes the Exchange the exclusive agent of the Association, although the agreement did provide that the Exchange might and should act as the agent of the Association in the shipment of all deciduous fruits under the control of the Association, save and except such fruit as should be sold by the Association for cannery purposes and ripe fruit.

It is provided further that out of all sales made by the Exchange of fruit delivered to it for shipment by the Association, 7 per cent should be deducted. No qualification appears in the agreement or exception made therein between green and ripe fruit handled by the Exchange for the Association. The same percentage was to be deducted for the service, and there is nothing in the agreement which indicates that there should be any difference in accounting for the 7 per cent withholdings whether the fruit handled was green or ripe.

The record likewise shows that no distinction was made in declaring dividends out of the withholdings between green and ripe fruit. The practice, as shown by the record, was to deduct 7 per cent from the proceeds received for the sale of fruit whether green or ripe, to treat the same as withholdings, and to declare installment payments out of the same as might be determined from time to time. This practice the record shows to have been followed, and this construction given to the contract by the parties involved during the entire period covered by this action. It follows, therefore, that the argument of the appellant that patronage dividends should not be considered or allowed for and on account of ripe fruits and grapes is contradicted by the practice of the appellant, and the construction placed upon the contract and the by-laws by the parties interested.

We may therefore dismiss appellant's second contention as shown by the record to be untenable.

     In answer to appellant's contention that the Association did not comply with all the covenants and provisions of the agreement on its part to be kept and performed, it is contended that article XIX of the by-laws of the Exchange as it stood in 1907 referred only to the manner of making payment of refunds to the Association, and not as to a condition precedent; in other words, that the payment was to be made by the Exchange to the Association in the same manner as made to growers who had performed conditions necessary on their part to be kept and observed. However, it is not necessary to definitely determine the merits of this contention. As we have said, the record shows that each time article XIX of the by-laws was amended for each successive year, the parties acted as though the by-laws as amended applied to such successive year. The agreement in itself provided for its continuance from year to year, and the conduct of the parties as shown by the record read the amended by-laws into the contract as each successive amendment was adopted, and during the period involved in this controversy, article XIX of the amended by-laws omitted the words *"who have signed contracts and shipped consistently with this Exchange during the season when this dividend has been earned"*. Thus, after the amendment of article XIX of the by-laws of the Exchange, on March 25, 1920, there was neither condition precedent nor condition subsequent, requiring the Association to ship all of the deciduous fruit under its control, by or through the Exchange; nor does the record show any by-law of the Exchange in which the Association would or could be made subject to a forfeiture of the moneys belonging to it and withheld by the Exchange pending the determination of the amount that should be withheld to cover its expenses and dividend requirements. It must be understood that article XIX of the by-laws of the Exchange as amended in 1920 recognized the ownership of growers, shippers, and, as well, of this Association, to the moneys withheld by the Exchange. The term "withholdings" is expressly used in particularizing the portion of the 7 per cent which should have been repaid to the owners thereof

in percentage installments, as might be determined upon by the board of directors of the Exchange. This interpretation of the amended by-law was acted upon after its adoption in 1920, up to and including that portion of the year 1928 until the Association notified the Exchange of cancellation of the agreement, as provided therein. The Exchange having made yearly application of article XIX of its by-laws as amended, and having eliminated therefrom the provision relative to consistent shipment, we think the Exchange is estopped to assert any other construction.

In 6 California Jurisprudence, page 304, under the subject of "Contracts" and "Construction by Parties", the text reads: "The intention of the parties is to be ascertained by the writing alone, if possible, and not from the subsequent actions of one of them. However, it is well recognized that the terms of a contract may be manifested by conduct when not stated in words. And where the meaning is doubtful, the acts of the parties done under a contract afford one of the most reliable means of arriving at their intention. The law recognizes the practical construction of a contract as the best evidence of what was intended by its provisions. 'Contemporaneous exposition is in general the best.' Parties to a contract have a right to place such an interpretation upon its terms as they may see fit, even when such an interpretation is apparently contrary to the ordinary meaning of its provisions. It is to be assumed that they best know what was meant by its terms, and are the least liable to be mistaken as to its intention; that each party is alert to his own interests, and to insistence on his rights, and that whatever is done by them contemporaneously with the execution of the contract is done under its terms as they understood and intended it should be."

The principle that parties should be bound by the construction placed upon a contract by a long course of conduct is eminently just and fair, and, we think, amply supported by the authorities. (6 Cal. Jur., p. 306; *Alexander* v. *Walling,* 105 Cal. App. 525 [288 Pac. 138]; *Retsloff* v. *Smith,* 79 Cal. App. 443 [249 Pac. 886]; *Kennedy* v. *Lee,* 147 Cal. 596 [82 Pac. 257].)

Even if the construction given by the parties to the contract involved in this action, by reading into the contract

article XIX of the by-laws of the Exchange as amended from time to time is not the correct construction, yet under the wording of section 3516 of the Civil Code it was too late after twenty years of following such a construction, to insist upon an interpretation which would work a forfeiture of the rights of the Association.

▇ Notwithstanding the construction given to the application of the various amendments to article XIX of the by-laws of the Exchange, and the elimination of the consistent shipment which, by the way, in the original by-law affected only the particular year for which refunds were claimed, and did not otherwise affect the contract, the testimony in the record is sufficient to support the finding of the court that the Association did make all shipments as required by the agreement. The computation of the packages of fruit shipped by the Association through the Exchange and otherwise shipped by the Association is as follows: ''Packages shipped by the Association through the Exchange numbered 2,718,162; packages otherwise shipped numbered 137,957.'' In this particular it must be remembered that the agreement excluded cannery peaches or peaches that should be sold to canneries, and also ripe fruit.

As found by the trial court the amount of fruit shipped by the Association, other than through the Exchange, was less than 6 per cent, and of that 6 per cent a considerable quantity was ''Levi'' peaches, ordinarily known as ''canning peaches''. The opinion of the trial court, in referring to the ''Levi'' peaches, is as follows: ''With respect to the peaches the undisputed evidence is that the peaches were cannery peaches, were not under the control of the plaintiff, but were handled through its shipping house under a 'pooling' agreement, and with respect to the juice grapes the evidence quite clearly shows that the item of juice grapes was not contemplated when the contract was entered into; that at the time of the shipments the matter was discussed with the defendant's manager, and from the discussion had it is quite apparent that neither of the contracting parties regarded juice grapes as being included in the contract, and this conclusion is supported by evidence of the acts of the defendant in connection with its dealings with other persons with whom it had similar contracts.''

The evidence further shows by letters introduced in the record written on behalf of the Exchange, that at times there was considerable difficulty encountered in profitably marketing peaches, and that the Exchange was well aware of shipments made by the Association.

On behalf of the Association, in addition to what we have quoted from the opinion of the trial court relative to cannery peaches and juice grapes, sufficient testimony to support the finding of the court was introduced to the effect that the shipments made by the Association were of fruits properly coming under the classification of "ripe fruits".

As against the testimony on the part of the Association that its shipments were of ripe fruit, a great deal of oral testimony was introduced on the part of the appellant to the effect that such shipments were not of ripe fruits, and therefore should have been shipped through the Exchange. This contention is disposed of by the trial court as follows: "Further supporting the conclusion that the court was constrained to reach, there is direct testimony in connection with the ripeness or the maturity of the fruit based upon the opinions of the persons who personally handled or inspected the fruit, and all of them were men having had years of experience in the business of fruit shipping as well as in the growing of deciduous fruits, and whose testimony was that all of the fruit that was not marketed through the defendant was either ripe fruit or fruit used for cannery purposes."

A number of witnesses for the appellant based their opinion that the fruit shipped was not ripe fruit on the theory that the destination to which it was consigned was so far away that fruit classed as "ripe fruit" in the trade would be valueless when reaching its destination. A number of the witnesses testified that Elko, Nevada, was as far east of Loomis as ripe fruit could be successfully shipped. Defendant's Exhibit 28, however, shows that such contention is untenable. The heading of this exhibit is as follows: "1925—Cherry—peach—plum ripe fruit department". Examination of this exhibit shows that ripe fruit of various kinds was shipped to Pueblo, Colorado; Idaho Falls, Idaho; Ogden, Utah, Cheyenne, Wyoming; Bozeman, Billings, Butte and Livingston, Montana; also to Denver, Colorado; San

Antonio, Texas, and Klamath Falls, Eugene and Corvallis, Oregon. The number of days after shipment before the fruit would arrive at its destination is shown on defendant's exhibit No. 33, to wit: To Butte, Montana, five days; Billings, Montana, six days; Cheyenne, Wyoming, five days; Denver, Colorado, five days; Omaha, Nebraska, six days; Chicago, eight days; San Antonio, Texas, seven days; New York, the fruit would arrive on the eleventh day.

The testimony as appears by the exhibits introduced by and on the part of the appellant relative to the shipment of ripe fruit shows that ripe fruit was shipped to distant points, where it would not arrive prior to the fifth, sixth and seventh days, according to the points of destination. This fact justified the trial court in disregarding the opinion of witnesses, who had not seen the fruit that was shipped, and based their conclusions only upon inspection certificates that it could not have been ripe fruit because it would not have been marketable at points farther away than Elko, Nevada. We have not tabulated the number, but the exhibits introduced to which we have referred show that hundreds of packages of ripe fruit were shipped to points of destination more than twice the distance between Loomis, California, and Elko, Nevada.

We may add, further, that the testimony of the witness Day, who had been engaged in the fruit business for forty years preceding the trial of this action, shows clearly that the "Levi" peaches referred to in the opinion of the trial court which we have quoted were canning peaches, and that up to 1927 the California Peach Growers had marketed all of such peaches with the canneries, and that in 1927 the canneries refused to receive the same, and supports the conclusion of the trial court that such peaches were canning peaches; and the testimony of the witness is also further to the effect that the disposition of those peaches was discussed with the manager of the Exchange, and that while only a limited quantity of the "Levi" peaches were in fact disposed of, other than through the Exchange, no objection was made thereto by the Exchange, which further supports the conclusion of the trial court that such peaches were not considered by either the Association or the Exchange as coming within the terms of the agreement.

While the appellant in its argument schedules the different kinds of fruits shipped by the Association, claimed by it to be ripe fruit, to distant points, giving the number of hours that must elapse between the point of loading and the point of destination, and concludes therefrom that the opinion of the appellant's witnesses must be correct, the exhibits which we have referred to, and which were introduced by the defendant showing the marketing of ripe fruits, conclusively shows that the argument of the appellant, based upon the hours that must necessarily elapse between the time of loading and the time the fruit would reach its destination, is untenable. For instance, the number of hours are given that must elapse between the shipment of fruit from Loomis and reaching its destination at San Antonio, Texas, as 89 hours, and yet the exhibit shows that ripe fruit was actually shipped from Loomis to San Antonio, Texas. The necessarily elapsed time between Loomis and Denver is given as 62 hours. Nevertheless, the exhibits show ripe shipment from Loomis to Denver. The time that would elapse in making shipment from Loomis to Billings, Montana, is stated as 68 hours. Still, we find the schedule introduced by the defendant showing shipment of ripe fruit from Loomis to Billings, Montana. Other instances might be cited, but we content ourselves with the foregoing.

From all of this it is shown that while there was considerable opinion testimony to the contrary, the truth was presented to the court that ripe fruit could be, and was shipped from Loomis to points not only far more distant than the mileage between Loomis and Elko, Nevada, which required only about 30 hours, but to points requiring five, six and seven days to elapse between the date of shipment and the date of destination.

The conclusion from these facts is inescapable that even though we had arrived at a different · conclusion regarding the application of article XIX of the by-laws of the Exchange as it existed after March, 1920, the contention of the Association that its shipments outside of the Exchange were of fruits properly classed as "ripe fruits" was and is supported by sufficient testimony to uphold the findings of the trial court. The findings and judgment of the trial court as to the amount of money belonging to the Associa-

tion and withheld by the Exchange must be determined as found by the trial court and set forth in its judgment.

The appellant relies for support principally on the case of *Rusconi* v. *California Fruit Exchange,* 100 Cal. App. 750 [281 Pac. 84]. The respondent answers this contention by citing the case of *Buford* v. *Florin Fruit Growers' Assn.,* 210 Cal. 84 [291 Pac. 170]. Both of these cases have been carefully considered, but by reason of·what we have said showing the difference in the contracts acted upon by the Association and the defendant, involved in the case at bar, and the somewhat skeleton record presented in the Rusconi case, we do not deem it necessary to analyze either the Rusconi or the Buford cases further than to state that the dissimilarity between the facts presented for our consideration here and those presented to the court in the Rusconi case, are readily distinguishable, even though we were not placing reliance upon the different findings made in the different actions by the trial court. The Buford case need not be considered further than simply supporting what we have said, that the withholdings made by the Exchange were of moneys belonging to the Association and to the growers marketing fruit through the Exchange.

■ The only question that remains for further consideration is the decision of the trial court as to the payments which had not matured at the date of the entry of the judgment herein.

The original complaint in this action was filed on the twentieth day of June, 1929. Defendant's exhibits 31–A and 31–B show that 'the board of directors of the Exchange, in 1923, declared a 4 per cent refund on moneys withheld as hereinbefore stated, last installment falling due November 20, 1928. In 1924 a like 4 per cent refund was declared, final installment falling due November 18, 1929. In 1925 a like 4 per cent refund was declared, date of final refund not appearing on exhibit 31–A. In 1926, a 3 per cent refund was declared, payable in three installments, date of final payment not appearing on defendant's exhibit 31–A. In 1927, a 3⅓ per cent refund was declared, date of final payment not appearing; and in 1928 a 3¾ per cent refund was declared, payable in installments, date of payment of final installment not appearing on the exhibit. An examination of the record, however, shows the maturity of three

installments aggregating $30,381.14, as follows: January 11, 1932; January 10, 1933; January 8, 1934.

The appellants contend that the judgment determining that the Exchange is indebted to the Association in said sum on account of refund installments that had not matured at the date of the filing of the complaint or the entry of judgment herein, is erroneous, the point being made that the action, in so far as the three installments referred to are concerned, is premature.

On the part of the Association it is contended that the action is equitable in its nature; that the court had authority to determine the amount of money that was due, even though payment thereof might not be enforceable until a later date. It is also contended that that portion of the complaint which prays for declaratory relief under section 1060 of the Code of Civil Procedure is applicable. Our investigation of cases dealing with declaratory judgments leads to the conclusion that such a proceeding can only be invoked to declare rights and not to determine or try issues. So far as equity principles are involved, as contended for by the Association, we need not enter into any discussion. The state of the record, and a recent case decided by the Supreme Court of this state, we think determinative. Neither any of the demurrers nor answers filed by the Exchange tender the question of prematurity of any portion of the action. The instant case was not tried upon the theory that any portion of the action had not matured. It was tried solely and only upon the theory that the Association was not entitled to a refund of any portion of the money withheld by the Exchange on the asserted ground that the Association had not complied with its contract relative to the shipment of fruit through the Exchange. No question of prematurity of the action was presented to the trial court. It is presented here for the first time on appeal. No motion was made to vacate any part of the judgment, and the motion for a new trial, even if a ground therefor, does not suggest prematurity. In this action, if the Association is entitled to refunds of the moneys withheld by reason of what we have said herein, then the entire theory of the defense upon which the action was tried fails. That the judgment of the trial court contains one sentence that should be changed does not affect anything that we have

said relative to the theory upon which the case was tried. The appellant has cited a number of cases from other states. These, however, are not controlling here by reason of the decision of the Supreme Court of this state in the case of *Seches* v. *Bard*, 215 Cal. 79 [8 Pac. (2d) 835], decided February 17, 1932. That case involved a suit upon promissory notes, where it appeared during the trial that five notes totaling $20,000 had not matured and were unpaid. In that case the court said: ''Defendants did not plead that in reference to this $20,000 the action was premature, nor did they directly or indirectly present that point by motion or otherwise to the trial court. From a reading of the entire record it is obvious that the parties to the action tried the case on the theory that the sole question involved was the proportion that the contestants were entitled to share in the proceeds of the entire settlement. Defendants at no time objected that the $20,000 unpaid was in any different status than the $58,000 that had been paid, and in fact treated the entire $78,000 as being the fund in controversy. It was not until the case was appealed that defendants objected that as to the unpaid notes the action was premature. Respondent states in her brief that, since the trial all of the notes have been paid. This contention is not denied by appellants. On such a state of the record it would not only place an unnecessary burden on the parties to reverse the case in reference to the $20,000 unpaid at the time of trial, but such action would also be violative of certain well-settled legal principles. The rule has long been settled that the defense that an action is premature is in the nature of a dilatory plea not favored in the law, and that such defense must be seasonably urged in the trial court or it is waived. In the early case of *Hentsch* v. *Porter*, 10 Cal. 555, at page 561, the rule is stated as follows: 'Where the objection, if true, would only defeat the present right to recover, the defendant, though not compelled to demur or answer, should be obliged to make the objection, by motion or otherwise, before the court of original jurisdiction, during the term at which the judgment was obtained. But where the defect in the complaint is of such a serious character as to show that the plaintiff could never, at any time, obtain any judgment upon the cause of action alleged, then the defendant should

be allowed to make the objection for the first time in the Appellate Court.' This court, in the recent case of *Verbeck* v. *Clymer*, 202 Cal. 557, at page 562 [261 Pac. 1017, 1018], stated the rule in the following language: 'It is well settled that the plea that an action has been prematurely brought is in the nature of a dilatory plea which must be specially pleaded in order to be available as a defense. (*Realty & Rebuilding Co.* v. *Rea*, 184 Cal. 565, 573 [194 Pac. 1024]; *Bemmerly* v. *Woodward*, 124 Cal. 568 [57 Pac. 561].)' "

We have searched the record in vain to ascertain if any distinction was made between the several installment payments, and found none. Nor has our attention been called to any part of the record which would indicate that the case was tried upon any other theory than that if the Association was entitled to any portion of the withheld money, it was entitled to all. The whole controversy revolved around the issue as to whether the Association had forfeited its rights to any part of the money withheld. So far as the record speaks, the conclusion is inescapable that the case was tried upon the theory that if the Association was entitled to any of the refunds, it was entitled to all. It is too late now to take a different position. ■ The judgment of the court, however, goes further than to decide the right of the Association to the payments not matured at the time of the action, and includes an order that should be changed. Predicating this part of our opinion upon the case of *City of Rochester* v. *Rochester Ry. Co.*, 109 App. Div. 638 [96 N. Y. Supp. 152, 158], that portion of the judgment which reads, "That defendant shall pay said sums to plaintiff as they become due, as aforesaid; that execution shall issue for each amount as each amount shall become due", is amended to read as follows: "That execution shall not issue for such future instalments until after the date when such instalments shall become severally due." The case to which we have referred was followed in *Dancel* v. *Goodyear Shoe Machinery Co.*, 137 Fed. 157. This case was affirmed by the Circuit Court of Appeals in 144 Fed. 679.

The arguments of the respective parties have taken a somewhat wider range than we have included in this opinion, but what we have said we think determinative of the issues involved.

The motion to dismiss the appeal is denied. The judgment of the trial court as amended is affirmed. Respondent is awarded costs.

Pullen, P. J., and Thompson (R. L.), J., concurred.